# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

_____

AFP 104 CORP.,                              :
                                            :
        Plaintiff,                         :   Civil Action No. 13-CV- 04077-
                                            :   PGS-LHG
                                            :
v.                                          :
                                            :
COLUMBIA CASUALTY COMPANY,                  :
                                            :
        Defendant.                         :
                                            :
_____    :

## DEFENDANT'S REPLY IN SUPPORT OF ITS MOTION TO DISMISS PLAINTIFF'S COMPLAINT FOR FAILURE TO STATE A CLAIM

Charles G. Carluccio, III
COLLIAU CARLUCCIO KEENER
MORROW PETERSON & PARSONS
1249 South River Road
Suite 300A
Cranbury, NJ  08512
T  (609) 395-5970
F  (609) 655-6604
*Counsel for Defendant,*
*Columbia Casualty Company*

## TABLE OF CONTENTS

I. SUMMARY ................................................................................................1

II. ARGUMENT .............................................................................................3

    A. Sandy was a Named Storm under the plain terms of the policy. ...........3

        1. The court can take judicial notice that Sandy was declared a tropical storm and was never downgraded to a tropical depression. ...............................................................................3

        2. The Named Storm deductible applies to any storm that is declared a tropical storm until it is permanently downgraded to a tropical depression. ........................................5

        3. Sandy continued to have sustained hurricane-force winds long after it made landfall. .......................................................6

    B. Executive Order No. 107 is limited to homeowners insurance. ...........8

    C. The policy makes clear that the Named Storm deductible applies to claims for service interruption. ......................................................10

    D. The policy's 24-hour qualifying period for service interruption coverage is not a deductible. ..............................................................13

    E. AFP's feigned ignorance about the cause of the power outage does not affect the application of the Named Storm deductible. .........14

III. CONCLUSION AND REQUEST FOR RELIEF .........................................15

## TABLE OF AUTHORITIES

Page(s)

**CASES**

*Bexar County Hosp. Dist. v. Factory Mut. Ins. Co.*,
   475 F.3d 274 (5th Cir. 2007) ..................................................................................14

*Boddy v. Cigna Prop. & Cas. Co.*,
   760 A.2d 823 (N.J. Super. Ct. App. Div. 2000) ....................................................12

*Buck v. Hampton Twp. School Dist.*,
   452 F.3d 256 (3d Cir. 2006) .....................................................................................3

*Doug Grant, Inc. v. Greate Bay Casino Corp.*,
   232 F.3d 173 (3d Cir. 2000) .....................................................................................7

*Easy Sportswear, Inc. v. Am. Economy Ins. Co.*,
   No. 05-2283, 2008 WL 2682689 (W.D. Pa. 2008) .................................................3

*Geary v. Life Investors Ins. Co. of America*,
   508 F. Supp. 2d 518 (N.D. Tex. 2007) ..................................................................14

*Gresko v. Stewart Title Guar. Co., Inc.*,
   No. 08-cv-4251, 2009 WL 1010964 (D.N.J. April 15, 2009) ...............................16

*GTE Corp. v. Allendale Mut. Ins. Co.*,
   258 F. Supp. 2d 364 (D.N.J. 2003) ........................................................................15

*Homesite Ins. Co. v. Hindman*,
   992 A.2d 804 (N.J. Super. Ct. App. Div. 2010) ....................................................13

*J. Josephson, Inc. v. Crum & Forster Ins. Co.*,
   293 N.J. Super. 170 (App. Div. 1996) .............................................................13, 15

*Jacobs Eng'g Group, Inc. v. Allianz Global Risks US Ins. Co.*,
   No. BC432430, 2011 WL 9119282 (Cal. Super. Feb. 1, 2011) ............................13

*Mercedes-Benz USA, LLC v. ATX Group, Inc.*,
   No. 08-cv-3529, 2010 WL 3283544 (D.N.J. 2010) ...............................................12

*Passaic Valley Sewerage Com'rs v. St. Paul Fire & Marine Ins. Co.*,
   21 A.3d 1151, 1157-58 (N.J. 2011) .......................................................................12

*Pittston Co. Ultramar Am. Ltd. v. Allianz Ins. Co.*,
    124 F.3d 508 (3d Cir. 1997) .............................................................................13

**STATUTES**

N.J. Stat. Ann. § 17:36-5.34................................................................................. 9-10

N.J. Admin. Code § 11:2-42.7(a).............................................................................10

**OTHER AUTHORITIES**

Executive Order No. 107 ......................................................................................2, 9

Fed. R. Evid. 201 ......................................................................................................3

Defendant Columbia Casualty Company ("Columbia") files this reply in support of its Motion to Dismiss Plaintiff's complaint pursuant to Federal Rule of Civil Procedure 12(b)(6).

## I. SUMMARY

AFP's complaint asserts four reasons why the Named Storm deductible should be inapplicable to the damage caused by Hurricane Sandy to the Ocean Place Resort and Spa (the "Resort"). In attempting to avoid dismissal, however, AFP now makes an entirely new argument, not found in its complaint, that the National Weather Service's ("NWS") classification of Hurricane Sandy as "post tropical" at landfall means that it should not be considered a Named Storm for purposes of the Named Storm deductible. AFP's new argument, like its original ones, is inconsistent with the plain language of the policy.

Sandy's classification upon landfall as "post tropical" has no bearing on the application of the Named Storm deductible because the policy language does not depend upon how a storm is classified "upon landfall" or whether it is classified at some point as "post tropical." The deductible provision defines a Named Storm as any storm that "has been declared" to be either a hurricane or tropical storm. AFP's complaint concedes that Sandy had been declared a hurricane. The policy also states how long a storm will be considered a Named Storm: a storm's designation as a Named Storm "begins" with the official hurricane or tropical storm declaration and "ends" when the storm "has been permanently downgraded to a tropical depression." A storm is downgraded to a tropical depression based upon the

reduction of the storm's wind speed. Whether a storm is classified as post-tropical has nothing to do with wind speed and is irrelevant to its status as a Named Storm. There is no dispute that Sandy was declared a tropical storm and was never downgraded to tropical depression. Indeed, the NWS advisories make clear that the earliest Sandy <u>could</u> have been downgraded based on a wind speed comparable to a tropical depression was *after* Sandy had damaged AFP's resort. Accordingly, applying the plain language of the policy, Sandy became a Named Storm when it was declared a tropical storm, and it never ceased to be a Named Storm because the policy's requirements for that to happen – a downgrade to a tropical depression – never occurred.

AFP's original four arguments also remain legally invalid. First, AFP provides no reason why Executive Order No. 107, which was specifically addressed towards homeowners policies, would apply to commercial policies like the one at issue here. Second, AFP's position that the Named Storm deductible cannot apply to a service interruption claim is inherently unreasonable because it would render entire clauses of the service interruption provision meaningless. Third, AFP's four-sentence defense of its position that the 24-hour qualifying period is actually a separate deductible conflicts with the plain language of the policy. Finally, AFP seeks coverage for service interruption and therefore must allege facts sufficient to bring the claim within coverage; taking either of AFP's own inconsistent allegations about the cause of the service interruption, there is no coverage.

AFP's complaint fails to state a claim upon which relief can be granted. Columbia therefore requests that this court dismiss the complaint in its entirety.

## II.   ARGUMENT

**A.   Sandy was a Named Storm under the plain terms of the policy.**

    **1.   The court can take judicial notice that Sandy was declared a tropical storm and was never downgraded to a tropical depression.**

AFP contends the court can take judicial notice of the NWS advisories and notices issued with respect to Hurricane Sandy.  Columbia therefore requests that the court take judicial notice of the NWS advisories, which demonstrate that Sandy was declared a tropical storm and never downgraded.  The weather data from Hurricane Sandy can accurately and readily be determined from the NWS advisories.  *See* Fed. R. Evid. 201; *see also Easy Sportswear, Inc. v. Am. Economy Ins. Co.*, No. 05-2283, 2008 WL 2682689, at *1 (W.D. Pa. 2008) ("The Court finds that historical weather conditions are not subject to reasonable dispute in that they are capable of accurate and ready determination.").  The court can consider matters of public record, like historical weather data regarding Hurricane Sandy, in deciding a motion to dismiss.  *See Buck v. Hampton Twp. School Dist.*, 452 F.3d 256, 260 (3d Cir. 2006).  Columbia therefore requests that the court take judicial notice of the facts reported in the NWS advisories concerning Hurricane Sandy.  For the court's convenience, the advisories are attached to this reply as Exhibit 1 and are also available at www.nhc.noaa.gov and www.hpc.ncep.noaa.gov.

The NWS classifies storms based on a variety of criteria. Tropical cyclones are classified as hurricanes, tropical storms, or tropical depressions, based upon their sustained wind speeds. *See* Glossary (Exhibits to Plaintiff's Response [Doc. 7-1 at 92-107]). Hurricanes have maximum sustained surface wind speeds of 74 mph or more, tropical storms have wind speeds of 39 mph to 73 mph, and tropical depressions have wind speeds of 38 mph or less. *Id.* The distinction between a tropical cyclone and a post-tropical cyclone is determined by the storm's convective structure and energy source. *Id.* Tropical cyclones draw their energy from the displacement of warm ocean water. Post-tropical cyclones, however, are driven by their baroclinity – the temperature contrast between warm and cold air masses. *Id.* The NWS specifically states, however, that post-tropical cyclones may have hurricane- and tropical-storm-force winds, as in the case of Sandy. *Id.* ("It is important to note that cyclones can become extratropical and still retain winds of hurricane or tropical storm force.")

The first advisory issued by the NWS's National Hurricane Center ("NHC") for the storm that would become Hurricane Sandy came at 11:00 a.m. on Monday, October 22, 2012. *See* Ex. 1 (Advisory 1).[1] At that time, Sandy was an unnamed tropical depression, with maximum sustained winds of 30 mph. *Id.* Six hours later, at 5:00 p.m., the NHC declared that the storm had reached tropical-storm-force winds of 40 mph and named it Sandy. *Id.* (Advisory 2). Two days later, on

---

[1] The advisories are available at www.nhc.noaa.gov/archive/2012/SANDY.shtml and www.hpc.ncep.noaa.gov/tropical/tropical_advisories.php?storm=SANDY&adnum=32&dt.

4

October 24, 2012, the NHC reclassified Sandy as a hurricane after its sustained winds reached 80 mph.  *Id.* (Advisory 9).

At 7:00 p.m. on October 29, 2012, just before landfall, the NHC declared that Sandy continued to have hurricane-force wind speeds of 85 mph, but classified it as post-tropical because its convective structure had changed due to "baroclinic forcing."  *Id.* (update to Advisory 30).  The NHC's classification of Sandy as post-tropical related to the change in the storm's energy source and structure, not the intensity of its wind speeds.  *Id.*  In fact, at the time Sandy made landfall, it still had hurricane-force winds, and continued to have hurricane- and tropical-storm-force winds (wind speeds 39 mph or greater) through 11:00 p.m. on October 30, 2012.  *Id.* (Advisory 31).  The first time after landfall that the storm had sustained winds of 38 mph or less – equivalent to a tropical depression – was at 5:00 a.m. on October 31, 2012, as reflected in an advisory issued by the Hydrometeorological Prediction Center ("HPC").  *Id.* (Advisory 32).  That occurred <u>after</u> the period that AFP alleges Sandy struck New Jersey – "[b]eginning on October 28, 2012 and continuing through October 30, 2012."  Complaint, at p. 5, ¶ 18.

> 2. **The Named Storm deductible applies to any storm that is declared a tropical storm until it is permanently downgraded to a tropical depression.**

The lone sentence in AFP's complaint concerning the storm classification of Hurricane Sandy states that "[u]pon landfall in New Jersey, Sandy was

5

characterized as a post-tropical storm."[2] AFP now contends that this single allegation is so "key" that it defeats Columbia's motion to dismiss. AFP's contention is contradicted by the plain language of the policy, but AFP simply disregards the controlling language.

The policy's definition of Named Storm dictates both when a Named Storm begins and its duration:

> A storm system that has been declared to be a named tropical storm or hurricane by the U.S. National Weather Service or other governmental authority including hurricane or tropical storm spawned tornado(s) or microburst(s). The named tropical storm or hurricane begins when the National Weather Service officially declares the storm system to be a named tropical storm or hurricane and ends when the National Weather Service officially declares the named tropical storm or hurricane permanently downgraded to a tropical depression.

Motion to Dismiss, Ex. A at 46. So any storm that is declared a tropical storm or a hurricane is a Named Storm, and it does not cease to be a Named Storm until downgraded to a tropical depression.

### 3. Sandy continued to have sustained hurricane-force winds long after it made landfall.

AFP does not dispute that Sandy became a Named Storm, as defined by the policy, when the NHC declared on October 22, 2012 at 5:00 p.m. that the

---

[2] AFP acknowledges that its newfound argument was not part of its complaint. *See* Response at 5 n. 2. AFP alternatively seeks leave to amend its complaint if the court finds its allegations insufficient to state a claim. To the extent the court considers AFP's footnoted request for leave to amend, the request should be denied as futile. *See Doug Grant, Inc. v. Greate Bay Casino Corp.,* 232 F.3d 173, 188-189 (3d Cir. 2000) (denial of leave to amend proper because "it would be futile to amend the complaint to include a meritless claim"). There is no set of facts or argument AFP can allege to avoid the application of the Named Storm deductible.

"depression strengthens into tropical storm Sandy" with maximum sustained winds of 40 mph. Ex. 1 (Advisory 2). Sandy reached hurricane strength on October 24, 2012 at 11:00 a.m. when the NHC advised that it had maximum sustained winds of 80 mph. *Id.* (Advisory 9). Under the policy terms, Sandy indisputably became a Named Storm when it was declared a named tropical storm.

AFP's argument that Sandy stopped being a Named Storm when it was later classified as post-tropical simply ignores the controlling policy language. The policy states that a Named Storm ends only when it is "permanently downgraded to a tropical depression." Sandy was never downgraded to a tropical depression, and its wind speeds remained too high to permit such a downgrade. The classification of Sandy as a post-tropical cyclone was based on its convective structure, but it continued to have hurricane-force or tropical-storm-force winds until at least October 30, 2012 at 11:00 p.m., when it was reported as having maximum sustained winds of 40 mph. Ex. 1. The first NWS report that would justify a downgrade to tropical depression – meaning wind speeds below 39 mph – was not until 5:00 a.m. on October 31, 2012. *Id.* Because the NWS never declared that Sandy had been "permanently downgraded to a tropical depression," Sandy remained a Named Storm under the plain language of the Named Storm deductible.

This is consistent with the intent reflected in the language of the Named Storm deductible. The deductible distinguishes between tropical depressions (to which the named storm deductible does not apply) and tropical storms or hurricanes (to which the named storm deductible does apply). It is wind speed that

7

drives that distinction.  But a storm's classification as a post-tropical cyclone has nothing to do its wind speed.  *See* Glossary [Doc. 7-1 at 92-107].  Sandy continued to have wind speeds consistent with a hurricane or tropical storm until October 31, 2012 (and continued to be referenced by the NWS by the name "Sandy").  Ex. 1. Consequently, it is entirely consistent with the intent of the policy for the Named Storm deductible to be applied based on Sandy's wind speed, even if Sandy's convective structure prompted the NWS to classify it as post-tropical.[3]

**B.     Executive Order No. 107 is limited to homeowners insurance.**

AFP's unsupported argument and references to online news articles cannot alter the scope and application of Executive Order No. 107 to extend to commercial property insurance.  Far from being "non-sensical," the conclusion that the Order does not apply to commercial property policies is necessitated by the language of the Order itself and is consistent with the manner in which homeowners policies and commercial policies are regulated.

The Order is expressly limited to homeowners' insurance.  The Order first references and invokes the Department of Banking and Insurance's "authority to establish by regulation uniform policy language regarding the applicability of

---

[3] AFP's argument wrongly assumes that the damage to its resort did not occur until after Sandy made landfall, when it was classified as post-tropical. Landfall occurs when the <u>eye</u> of a hurricane hits land, but hurricane-force winds affect structures on land well before "landfall," particularly with a large hurricane like Sandy.  Because the distinction between a tropical and post-tropical cyclone is irrelevant to the application of the Named Stormed deductible, that issue does not affect Columbia's motion to dismiss. However, to the extent the court believes the distinction somehow makes a difference in the application of the deductible, there would be a factual issue as to precisely when Sandy's winds damaged the resort.

8

hurricane deductibles," citing NJSA 17:36-5.34. *See* Motion to Dismiss, Ex. C. Section 17:36-5.34 pertains to the uniform policy language applicable to *homeowners'* insurance:

> The commissioner shall establish by regulation uniform policy language regarding the applicability of hurricane deductibles and the form of notice to be provided to an insured under a **homeowners** insurance policy by an insurer utilizing a hurricane deductible program or programs.

N.J. Stat. Ann. § 17:36-5.34 (emphasis added). On the basis of that authority, the Order's enforcement provision deeming an administrative violation is based exclusively on New Jersey Administrative Code section 11:2-42.7, which also pertains only to homeowners' insurance:

> The uniform policy language that shall be utilized for all mandatory and optional hurricane deductible programs for **homeowners' insurance** is as set forth in Exhibit D in the Appendix to this subchapter, incorporated herein by reference.

N.J. Admin. Code § 11:2-42.7(a) (emphasis added).

In other words, the Department of Banking and Insurance, by statute, was tasked with supplying the uniform language for hurricane deductibles in homeowners' policies. Exhibit D to section 11:2-42.7 is that language. The Order, by making it a violation of section 11:2-42.7 to apply the statutorily-mandated hurricane deductible to Sandy, invokes and exercises the existing authority of the Department of Banking and Insurance to dictate the application of hurricane deductible in homeowners' policies. The deeming of a violation of section 11:2-42.7 is simply a legal fiction: if an insurer applies the uniform language that the

government says does not apply, the Order deems that the insurer veered from statutorily-required language in the first place.

The legal fiction cannot extend to commercial insurers because there is no statutorily-required hurricane deductible language for commercial insurance policies, like the Columbia policy. That is why the policy has a Named Storm deductible, not a "hurricane deductible" identical to Exhibit D to section 11:2-42.7. It is not required. An insurer cannot be deemed to have violated a requirement for statutory language that it was never required to meet. In short, the Order does only what its title suggests: "Protect Storm-Impacted **New Jersey Homeowners** from Higher Insurance Deductibles." It has no application to resort owners like AFP that purchased commercial property insurance.

C.  **The policy makes clear that the Named Storm deductible applies to claims for service interruption.**

The policy provides service interruption coverage when places *other than* the covered Location (the Resort) are damaged, which in turn causes damage to the covered property. *See* Motion to Dismiss, Ex. A at 24. The prerequisite for service interruption coverage is that damage occurred at unowned, uncovered locations. In that case, the policy specifically states that "the deductible for this coverage is the applicable deductible for the covered peril causing such physical loss or damage to such unowned property." *See id.* So if a Named Storm caused the damage that resulted in the service interruption, the Named Storm deductible applies.

AFP nevertheless contends that the policy does mean what it says. Instead, AFP's posits that, regardless of the plain language of the service interruption provision, the Named Storm deductible should never apply "to damage that takes place away from the Resort." Response at 14. AFP's interpretation makes no sense. To accept AFP's interpretation would mean that the Named Storm deductible can never apply to service interruption coverage, which requires damage to property other than the insured location. AFP's reading of the policy would render the following clauses meaningless:

> (1) The physical damage deductible for this coverage *is the applicable deductible for the covered peril causing such physical loss or damage to such unowned property*.
>
> . . .
> In the event that the qualifying period has been satisfied, the Company shall then be liable for the amount of the **Time Element** loss until the resumption of **Normal** operations, *in excess of the applicable deductible for the covered peril causing such physical loss or damage to such unowned property*.

Motion to Dismiss, Ex. A at 24 (italics added for emphasis). AFP's interpretation is, therefore, inherently unreasonable and goes against the well-established rules of contract construction.[4] *See, e.g., Homesite Ins. Co. v. Hindman*, 992 A.2d 804, 807

---

[4] AFP suggests the language of the service interruption provision is ambiguous and should be construed against Columbia. But a "far-fetched interpretation" does not create an ambiguity. *Boddy v. Cigna Prop. & Cas. Co.*, 760 A.2d 823 (N.J. Super. Ct. App. Div. 2000). "Most important, the rule that contracts of insurance will be construed in favor of the insured and against the insurer will not be permitted to have the effect of making a plain agreement ambiguous and then construing it in favor of the insured." *Passaic Valley Sewerage Com'rs v. St. Paul Fire & Marine Ins. Co.,* 21 A.3d 1151, 1157-58 (N.J. 2011). AFP's proposed interpretation that directly

11

(N.J. Super. Ct. App. Div. 2010) ("We will not read one policy provision in isolation when doing so would render another provision meaningless."); *J. Josephson, Inc. v. Crum & Forster Ins. Co.*, 293 N.J. Super. 170, 216 (App. Div. 1996) ("[A]n insurance contract must be interpreted by considering the agreement as a whole, and whenever possible, meaning must be given to all of its parts.").

Tellingly, the only support AFP can muster for such an inherently unreasonable interpretation is an order issued by a California trial court in *Jacobs Eng'g Group, Inc. v. Allianz Global Risks US Ins. Co.*, No. BC432430, 2011 WL 9119282 (Cal. Super. Feb. 1, 2011). *Jacobs* is neither controlling nor persuasive. In fact, the policy at issue in *Jacobs* did not even contain language dictating the applicable deductible for service interruption coverage – the language that actually controls here. *See id.* AFP cannot avoid the policy's controlling language by simply ignoring it. Its reliance on an obscure trial court order construing completely different policy language is grossly misplaced.

---

contradicts the policy language does not support a claim of ambiguity. Even if the court believes there is an ambiguity, however, a court cannot simply adopt an insured's proposed interpretation at the motion to dismiss stage of the proceeding. *See Mercedes-Benz USA, LLC v. ATX Group, Inc.*, No. 08-cv-3529, 2010 WL 3283544, at *3 (D.N.J. 2010); *see also Pittston Co. Ultramar Am. Ltd. v. Allianz Ins. Co.*, 124 F.3d 508, 523 (3d Cir. 1997) (applying New Jersey law) ("When a contract is ambiguous, the 'fact-finder must attempt to discover what the contracting parties ... intended[the disputed provisions] to mean.'").

**D.  The policy's 24-hour qualifying period for service interruption coverage is not a deductible.**

AFP contends that Columbia "cites no authority for its assertion that the 24-hour period is not a deductible." Response at 14. The "authority" is the policy language itself. Time element claims under the service interruption coverage extension are not triggered until service has been interrupted for 24 hours. This waiting period is not a deductible, as is clear by the terms of the service interruption provision, quoted above, that specifically dictate that the applicable deductible is the deductible that applies to the covered peril that caused the service interruption.

AFP cites cases that are inapposite because each involved policies that actually had a deductible measured by time. *Bexar County Hosp. Dist. v. Factory Mut. Ins. Co.,* 475 F.3d 274, 277 (5th Cir. 2007) ("[T]he deductible for a time element loss resulting from 'Boiler and Machinery' damage will be '1 Day Equivalent Time Element, subject to a minimum of 25,000.'"); *Geary v. Life Investors Ins. Co. of America*, 508 F. Supp. 2d 518, 519 (N.D. Tex. 2007) ("The Policy provides for a 'nursing-home benefit' of fifty dollars per day for an inpatient stay in a nursing home for an unlimited period of time <u>after a deductible period of 100 days</u>." (emphasis added)). The policy here does not, AFP's fantastical interpretation notwithstanding.

Finally, AFP fails to address the nullifying effect of interpreting the 24-hour waiting period as a deductible. If the 24 hour period is somehow construed as a deductible, section C.33.b.(2) – quoted above – would be rendered superfluous.

13

An interpretation that renders a portion of the policy meaningless cannot be accepted. *See J. Josephson, Inc.*, 293 N.J. Super. at 216-17.

### E. AFP's feigned ignorance about the cause of the power outage does not affect the application of the Named Storm deductible.

AFP's complaint is inconsistent. On the one hand, AFP alleges that "Sandy caused widespread damage to property associated with the provision of electrical services" and that all of its losses were "from Sandy." *See* Complaint, p. 5 ¶¶ 18-19). On the other, AFP contends that "it has not been established and is not clear what caused the actual power outage resulting in AFP 104's service interruption claim." *Id.* (¶ 29). As Columbia previously pointed out, both allegations cannot be true, but there is no coverage either way: if Sandy caused the service interruption then the Named Storm deductible applies, but if AFP claims to have no idea what caused the service interruption then it has not satisfied its burden of stating a claim that comes within the terms of the policy.

In response, in addition to adhering to its position that Sandy was not a Named Storm, AFP argues that because the Columbia policy is an "all-risk" policy, Columbia bears the burden of proving that the cause of a loss is excluded. AFP suggests that it merely needs to allege an unknown loss, and the burden then shifts to Columbia to prove that the loss comes within an exclusion. AFP misses the point, which has nothing to do with an exclusion. Even under "all-risk" policies, not all losses are covered: "All risk policies are not 'all loss' policies." *GTE Corp. v. Allendale Mut. Ins. Co.*, 258 F. Supp. 2d 364, 373 (D.N.J. 2003). AFP must, as a threshold matter, allege a claim that comes within the basic terms

of coverage. *See, e.g., Gresko v. Stewart Title Guar. Co., Inc.,* No. 08-cv-4251, 2009 WL 1010964, at *2-3 (D.N.J. April 15, 2009). Here, AFP's claim for service interruption coverage is distinct from its claim for direct physical loss to the Resort. Direct physical damage to a covered Location is addressed by the "all-risk" insuring agreement. But service interruption coverage "extends" coverage only under specific circumstances: "when any direct physical loss or damage to unowned property…is caused directly by peril(s) insured against… and which, without the intervention of any other independent cause, results in a sequence of events which cause direct physical loss or damage to covered property…." *See* Motion to Dismiss, Ex. A at 24. AFP therefore cannot satisfy its burden by simply relying on an all-risk insuring agreement that applies to direct physical loss at a covered Location. It must plead and prove that its service interruption was the result of direct physical loss or damage to unowned property **and** that that loss or damage was caused by a peril insured against. For that reason, AFP's inconsistent allegation that it has no idea what, where, or how the power outage occurred fails to bring the claim within the terms of the policy.

### III. CONCLUSION AND REQUEST FOR RELIEF

AFP has not, and cannot, allege a claim for which it is entitled to relief. Columbia, therefore, asks the court to dismiss AFP's complaint in its entirety.

Dated: August 12, 2013	Respectfully submitted,

                                            COLLIAU CARLUCCIO KEENER
                                            MORROW PETERSON & PARSONS


                             By: <u>s/ Charles G. Carluccio, III</u>
                                     Charles G. Carluccio, III
                                     1249 South River Road
                                     Suite 300A
                                     Cranbury, NJ 08512
                                     T (609) 395-5970
                                     F (609) 655-6604
                                     *Counsel for Defendant,*
                                     *Columbia Casualty Company*